UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THE LAPIDUS LAW FIRM**, PLLC,<br>　　　　Plaintiff,<br><br>　　　　v.<br><br>**WASHINGTON METROPOLITAN<br>AREA TRANSIT AUTHORITY**,<br>　　　　Defendant. | Civil Action No. 1:20-cv-00161-JDB |

# THE LAPIDUS LAW FIRM'S OPPOSITION TO WMATA'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
# REPLY IN SUPPORT OF ITS
# MOTION FOR PARTIAL SUMMARY JUDGMENT

For over two years, The Lapidus Law Firm ("the Firm") has been helping Minnis and Ann Hendricks find out what happened when their daughter Mariam Hendricks, a disabled nonverbal adult, was in a Metro Access van that was in an accident on I-270. For that whole time, WMATA has resisted releasing information. None of its current excuses meet the strict requirement of PARP.

### I.　The Collision Information Form should be unredacted.

WMATA has not established that the redactions on the Collision Information Form are appropriate. To redact information, an agency must establish that an individual faces a "clearly unwarranted" harm to his or her privacy interest if the material is released. PARP § 6.1.6. Any

1

claimed threat to privacy must rise to something "more palpable than mere possibilities." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 380 n.19, 96 S. Ct. 1592, 1608 (1976).

Yes, addresses and phone numbers sometimes may fall within a privacy interest. *See People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 304-05 (D.D.C. 2007) (collecting cases). But not every name, address, or phone number does. The threat to privacy is a contextual question. "[W]hether disclosure of a list of names is a 'significant or a de minimis threat depends upon the characteristic(s) revealed by virtue of being on the particular list, and the consequences likely to ensue.'" *U.S. Dep't of State v. Ray*, 502 U.S. 164, 176 n.12, 112 S. Ct. 541, 548 (1991) (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 279 U.S. App. D.C. 27, 31, 879 F.2d 873, 877 (D.C. Cir. 1989)).

The case WMATA cites is an example of a situation when the circumstances suggested potential harm to those people whose names a FOIA requestor sought to learn. *Painting & Drywall Work Pres. Fund v. Dep't of Hous. & Urban Dev., 936 F.*2d 1300 (D.C. Cir. 1991). That litigation resulted because a cooperative of unions was investigating compliance with a Davis-Bacon Act, which requires the federal government to pay contractors prevailing wages. *Id*. at 1301. The cooperative sought names, addresses, social security numbers, and pay information. *Id*. The deluge of attention, legitimate and fraudulent, to those whose income would be made public was easy to imagine. *Id.* at 1303. The financial information was the key. Indeed, as the Circuit Court has summarized, the relevant standard is that "individuals have a privacy interest in the nondisclosure of their names and addresses in connection with financial information." *Lepelletier v. FDIC, 164 F.3d* 37, 47 (D.C. Cir. 1999). Here, there is no financial information that could be gleaned from the requested record.

Against that minimal-to-non-existent privacy interest, this Court must balance the public interest at stake in release. As WMATA concedes, the public interest in any open records litigation is the public's ability to know what an agency is "up to." *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 495-97, 114 S. Ct. 1006, 1012-13 (1994). This entire litigation about trying to learn what WMATA was "up to." The Firm is trying to figure out what happened to a disabled, nonverbal, vulnerable woman entrusted to the care of WMATA. In the hands of this quasi-governmental agency, she was injured in a motor vehicle crash and held at the side of the road for hours. Finding out from the only available sources what happened to this woman is a quintessential example of finding out what WMATA did or did not do.[1]  The Firm seeks contact information for individuals who were involved so that it can investigate what happened.

## II.     The cost repair estimate should be released.

### A.  The estimate is not confidential commercial information.

WMATA continues to improperly withhold almost the entire cost repair estimate. For the first time, in its brief, WMATA produces a section of this document.[2] This is exactly why agencies have a duty to redact and produce what the remainder. PARP §6.2. If WMATA can include snippets in a brief, it should have produced that information in response to the Firm's original PARP request.

---

[1] One area that the Firm might investigate, for example, is how anyone determined that the non-verbal, disabled passenger did not require or request medical attention, as noted on the incident report, ECF 16-6, p. 17.

[2] The Firm has no reason to doubt that the graphic on page 7 of WMATA's brief is an accurate copy of a footer in the cost repair estimate.

From this snippet, we learn that the estimate was performed using a product called Audatex. Audatex is one of a few brands of computer software that most insurers and automotive repairs shops use to estimate the cost of repairs and replacements of damaged vehicles. *See, e.g.*, F*TC v. CCC Holdings Inc.,* 605 F. Supp. 2d 26, 30 (D.D.C. 2009). And thus we can see that this withheld document is a basic repair estimate.[3]

With this small disclosure, WMATA's argument for withholding the bulk of the document has shifted from claiming that the repair shop had a self-evaluative privilege in the estimate, *see* ECF 16-3, to a claim that the repair shop estimate is protected by the general confidential commercial information privilege, *see* ECF 17 at 5. This newly claimed exemption prohibits the disclosure of non-governmental entity's confidential commercial or financial information provided to an agency. *See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019).[4]

---

[3] Audatex makes some of its support documents available to the public at http://mysupportgarage.com/documents/10597/69591/Database+Reference+Manual+for+Cars+%26+Light+Trucks/a7ef541a-6b2a-4d5e-b6e1-e6e21667c37c. The company explains that

> Audatex estimating applications, coupled with the Audatex database, provide access to millions of pieces of information on parts, prices, and labor. Audatex automatically:
> - provides OEM part numbers, part prices, and labor.
> - performs all necessary calculations and totals including any discounts, markups, adjustments, and tax computations.
> - deducts overlap (defined as any operation common to the replacement of two or more parts).
>
> Net labor after deduction for overlap is provided in the estimate printout. Audatex provides the estimate preparer an accurate, legible, professional quality estimate

*Id* at 11.

[4] As much as Defendant's arguments rest on the competitive disadvantage test described in *Baker & Hostetler L.L.P. v. U.S. DOC, 47*3 F.3d 312 (D.C. Cir. 2006), it is no longer good law. The competitive disadvantage test developed by this Circuit in *Nat'l Parks & Conserv. Ass'n v.*

4

To qualify under this exemption, information must be traditionally kept confidential and might have to be provided to the government only under assurances that it would be kept confidential. *Id.* at 2363.

Repair shops stay in business by telling any member of the potential buying public what vehicle repairs cost. Repair estimates are not like the store-level welfare benefit usage at issue in *Argus Leader*, which would not be available to any random person who walked into a grocery store and asked for it. Nor is it like the information about construction and operation of nuclear facilities at issue in *Critical Mass Energy Project v. NRC*, 975 F.2d 871, 879-80, 298 U.S. App. D.C. 8 (D.C. Cir. 1992) (en banc). Any random person asking for that information would be refused, and possibly be referred to law enforcement for investigation. Here, the Firm seeks a repair estimate from a garage. Any repair shop that told potential customers that it would not share its pricing would soon find itself without customers. Estimates are not confidential information. The copied footer is not to the contrary. It is a reminder to the garage that it should only give the estimate to those involved in the claims process, which WMATA was. It cannot shape WMATA's legal obligations under the PARP. WMATA also makes no showing that it represented to the repair shop that the estimate would be kept confidential and that the repair shop provided the estimate relying on that representation.

---

*Morton, 49*8 F.2d 765 (D.C. Cir. 1974), used in *Baker & Hostetler*, was explicitly overruled by the Supreme Court last year. *Food Mktg. Inst.*, 139 S. Ct. 2356.

### B. The cost repair estimate is also not shielded by the deliberative process privilege.

WMATA raises a second, factually inconsistent, argument for withholding the estimate. After arguing the repair shop was a separate entity which shared confidential information with WMATA, WMATA then argues instead that the shop was so closely intertwined with its internal functioning that the documents it created should be covered by the deliberate process privilege of exemption 5. To fall under exemption 5, a document must both originate within a government agency and it "must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *DOI v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8, 121 S. Ct. 1060, 1065 (2001). One possible discovery privilege, available only to the government, is the deliberative process privilege, which covers "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Petrol. Info. Corp. v. U.S. Dep't of Interior*, 298 U.S. App. D.C. 125, 976 F.2d 1429, 1433 (D.C. Cir. 1992). The deliberative process privilege exists to "encourage the 'frank discussion of legal and policy issues'" within the government." *Wolfe v. Dep't of Health & Human Servs., 83*9 F.2d 768, 773 (D.C. Cir. 1988). It must be construe "as narrowly as consistent with efficient Government operation" *Petrol. Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (citations and quotations omitted).

### 1. The estimate was not prepared by an entity that qualifies under the consultant corollary.

Because this estimate was not prepared in-house, WMATA cites the consultant corollary, a rule which allows some consultants to be treated as de facto agency insiders. *DOI*, 532 U.S. at 12,

121 S. Ct. at 1068. But the repair shop meets neither part of the test the Supreme Court has set out for what counts under the consultant corollary.

First, the consultant must "not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it." *Id. at 11, 121 S. Ct. at 1065.* That is, the consultant's "only obligations" should be "to truth and its sense of what good judgment calls for," as "in those respects the consultant functions just as an employee would be expected to do." *Id.* For that reason, where non-agency parties "communicate with the [agency] with their own, albeit entirely legitimate, interests in mind," the consultant corollary likely does not exist. *Id.* A repair shop does not represent WMATA's interest. It is a profit-maximizing business. Ideally, from the business owner's perspective, the repair shop's interest in making money and WMATA's interest in getting a vehicle repaired will coincide. Perhaps, to preserve a long-term profitable relationship, a repair shop will lose money on an individual repair. But ultimately, the repair shop must look out for its own interests, not WMATA.

Second, a non-agency party does not act as a consultant to the agency when it "self-advocates at the expense of others seeking benefits inadequate to satisfy everyone." *Id.* As the Supreme Court emphasized, a "dispositive" question is whether the purpose of the third party's communications is to obtain an agency decision to support a claim "that is necessarily adverse to the interests of competitors." *Id.* Again, a repair shop is trying to get business, at the expense of its competitors. It is not advising WMATA only for WMATA's sake.

## 2. In any case, the estimate is not a predecisional deliberation.

Even if the document were prepared by a contractor so aligned with WMATA that the consultant corollary did apply, the document might still have to be produced. To withhold it, WMATA must establish that the deliberative process privilege applies. To meet that standard, WMATA would have to show that it was both deliberative and part of a specific decision-making process—that is, predecisional. *Access Reports v. Dep't of Just.*, 926 F.2d 1192, 1194 (D.C. Cir. 1991)

A document is deliberative "if it reflects the give-and-take of the consultative process." *People for the Am. Way Found.*, 503 F. Supp. 2d at 298 (citations omitted). The crux of the matter is "whether disclosure of the requested material would tend to discourage candid discussion within an agency." *Petrol. Info. Corp.*, 976 F.2d at 1434 (citations omitted).

In one of the cases WMATA cites, a deliberative process privilege was found for the requested documents. The withheld documents were materials were part of FEMA's "catastrophic planning" initiative and cleanup after Hurricane Katrina. *Citizens for Responsibility & Ethics v. U.S. Dep't of Homeland Sec.*, 514 F. Supp. 2d 36, 44 (D.D.C. 2007). The court stressed that none of the documents came from an entity with even the potential to be adverse to the agency. *Id.*

In the other case, the claim of deliberate process privilege failed. *100Reporters L.L.C. v. U.S. DOJ*, 248 F. Supp. 3d 115, 128-29 (D.D.C. 2017). As part of a plea agreement resolving a Foreign Corrupt Practices Act charge, a corporation needed to hire an independence compliance monitor. *Id.* The monitor conducted extensive investigations focused on whether the company created

8

internal compliance mechanisms and complied with all applicable laws and regulations. *Id*. But the Court of Appeals failed that DOJ failed to meet its burden to show a particular deliberative process in which the documents were used. *Id*. at 154. The court stressed that it takes more than "the mere consideration of a document" to bring it within the privilege—there must be "give-and-take of the consultative process." *Id*. at 153.

A cost repair estimate is more like the later example. It is a factual list, but it does not precede any policy decision. Nor does it reveal a back-and forth give-and-take of a deliberation. It is a pricing estimate. It is not covered by the deliberative process privilege.

> **3. Even if some of the estimate can be shielded, WMATA must redact it, not completely withhold it.**

Even if WMATA prevails on its argument that it can withhold part of the estimate, it should have redacted the document and released the rest. PARP § 6.2.

> **III. The incident report is full of overbroad redactions that cannot be fully analyzed without a Vaughn index.**

The redactions on the incident report are still overbroad. As one example, WMATA continues to try to justify redacting even the form questions. WMATA focuses on what it says is its desire to withhold information about whether the van driver was sent for testing, but WMATA has already revealed that the driver was in fact sent for drug and alcohol testing on this portion of the incident report:

> Lead Supervisor Michael Cofield was notified while at 8210 Beechcraft Ave, Gaithersburg, MD 20879 at 0822 and arrived on the scene at 0903. MACS passenger Marian Hendericks-121824 were on board. No medical attention requested or required by MACS operator or MACS passenger. MACS operator was removed from service and returned to base at 1018 for Post-Accident-FTA DOT Testing, [REDACTED] PARP Ex. 6.1.4, PARP Ex. 6.1.5, PARP Ex. 6.1.6 PARP Ex. 6.1.4, PARP Ex. 6.1.5, PARP Ex [REDACTED] DriveCam was activated. (XG5M39338) Major damages to MACS front bumper and grille, minor scratches to adverse vehicle rear bumper.

9

ECF 16-6 at 17 (yellow highlighting added).

Furthermore, the that a driver would be sent for drug and alcohol testing reveals essentially nothing in the case of a rear-end collision. The only legal reason a commercial company has for not sending a driver for testing is if the driver's performance can be "completely discounted" as contributing at all to the accident. 49 C.F.R. § 655.44 (the regulation relating to post-accident testing from the Federal Transit Administration of the Department of Transportation). In the case of a rear-end collision, a driver meeting such a standard is almost unfathomable. For example, in the District of Columbia, when a rear-end collision occurs with a lawfully stopped vehicle, there is a rebuttable presumption that the rear driver is at fault. *Fisher v. Best*, 661 A.2d 1095, 1099 (D.C. 1995). Without showing of an emergency or some other unusual condition, the rear driver is negligent as a matter of law. *Id.* The same is true in Maryland. *See* Md. Code Ann., Transp. § 21-310(a) ("The driver of a motor vehicle may not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the other vehicle and of the traffic on and the condition of the highway."). When a vehicle hits another from behind, there is a presumption that the striking driver was negligent. *See Andrade v. Housein*, 147 Md. App. 617, 810 A.2d 494 (2002). Even in an unusual situation, the rear driver's reaction time will always be an issue—which is presumably why the Department of Transportation instituted this regulation.

A proper *Vaughn* index would clarify what WMATA is using as a basis for its redactions of each question and answer. V*aughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). WMATA's simple citations to PARP exemptions do not replace an adequate *Vaughn* index for the incident report. To be adequate, a Vaughn index (1) "should be contained in one document," (2) "must adequately describe each withheld document or deletion from a released document," and (3) "must state the

exemption claimed for each deletion or withheld document, and explain why the exemption is relevant." *Dorsett v. U.S. Dep't of Treasury*, 307 F. Supp. 2d 28, 34 (D.D.C. 2004) (quoting *Founding Church of Scientology, Inc. v. Bell*, 195 U.S. App. D.C. 363, 603 F.2d 945, 949 (D.C. Cir. 1979)). The explanation "must be sufficiently specific to permit a reasoned judgment as to whether the material is actually exempt under FOIA." *Founding Church of Scientology*, at 949. Exemption 5 creates an "particularly acute" need for a detailed description in a *Vaughn* index. *Edmonds Inst. v. U.S. DOI*, 383 F. Supp. 2d 105, 108 n.1 (D.D.C. 2005). This need arises because "the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process." *Coastal States Gas Corp. v. Dep't of Energy*, 199 U.S. App. D.C. 272, 617 F.2d 854, 867 (D.C. Cir. 1980).

WMATA's black boxes and simple policy citations do not meet these standards, especially in the face of a claim of an exemption 5 deliberative process privilege.

This Court should not grant WMATA's motion for summary judgment. The Court should grant the Firm's motion for partial summary judgment and order WMATA to provide an unredacted collision information form and repair estimate, along with a less redacted copy of the incident report, with a *Vaughn* index.

Dated: December 11, 2020

                        Respectfully submitted,

                        */s/ Deborah M. Golden*
                        Deborah M. Golden
                        The Law Office of Deborah M. Golden
                        700 Pennsylvania Ave. SE, 2nd Floor
                        Washington, DC 20003
                        (202) 630-0332
                        dgolden@debgoldenlaw.com

                        Counsel for Plaintiff, The Lapidus Law Firm